IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | | |
|---|---|---|
| TREASA G. BASSETT, | ) | |
| | ) | |
| Plaintiff, | ) | 2:08-CV-978-BCW |
| | ) | |
| v. | ) | **MEMORANDUM DECISION AND** |
| | ) | **ORDER AFFIRMING THE** |
| MICHAEL J. ASTRUE, | ) | **COMMISSIONER'S DECISION** |
| Commissioner of Social Security, | ) | |
| | ) | Honorable Brooke C. Wells |
| Defendant. | ) | |
| | ) | |

Plaintiff Treasa Bassett filed suit seeking judicial review of the decision of the Commissioner denying her application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, respectively. *See* 42 U.S.C. §§ 401-33, 1381-1383f.[1] This case is before the undersigned United States Magistrate Judge by consent of the parties pursuant to 28 U.S.C. § 636(c). Docket no. 4, filed January 9, 2009. After careful review of the entire record, the parties' submissions, and arguments presented at a hearing held on March 25, 2010, the undersigned hereby AFFIRMS the decision of the Commissioner. As noted by the Court during oral argument, the Court finds the decision of the ALJ in this case to be one of the most thorough and well reasoned decisions that the Court has reviewed in a social security appeal.

## PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI pursuant to Titles II and XVI of the Act respectively on August 17, 2006 (Tr. 108-11, 112-14). *See* 42 U.S.C. §§ 401-33, 1381-83f. She alleged disability since May 31, 2004, due to degenerative joint disease, obesity, a cystic rupture, nerve damage, sleep apnea, and complex migraine headaches (Tr. 128, 139, 143, 187). After her

---

[1]All references to the U.S.C. (United States Code) are to the 2006 edition.

applications were denied in initial and reconsidered determinations (Tr. 50-53, 70-79, 83-88, 194), she requested a hearing before an administrative law judge (ALJ) (Tr. 89). After a hearing on June 9, 2008 (Tr. 6-49), the ALJ issued a decision on June 27, 2008 finding her not disabled (Tr. 54-69). Plaintiff requested review of the ALJ's decision (Tr. 4). The Appeals Council denied Plaintiff's request (Tr. 1-4), making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 404.981.[2]

## SUMMARY OF EVIDENCE

**(A)**     **Background.**

Plaintiff was 30 years old as of her alleged disability onset date and 34 years old on the date of the ALJ's decision (Tr. 50-53, 108, 112). She has a high school education (Tr. 134) and past work experience as a fast food worker and phlebotomist (Tr. 118-26, 129, 158-65).

**(B)**     **Medical Evidence.**

The medical evidence showed that, prior to her alleged onset date, Plaintiff had a history of treatment for sleep apnea, dysmenorrhea, menorrhagia, morbid obesity, irritable bowel syndrome, anxiety, depression, and hyperlipidemia (Tr. 451, 449-50, 454-62). She also had a history of treatment for headaches (Tr. 241-42, 255-56), On May 26, 2004, she presented to David Murray, M.D., who diagnosed her as a "morbidly obese 30-year-old female with a mass that [was] growing on the right inner aspect of her upper calf. This is most likely a lipoma." Plaintiff underwent surgical removal of this tissue (Tr. 318-22). Between June 13 and July 5, 2004, Dr. Murray admitted Plaintiff to the hospital three times for recurring cellulitis, which he treated with intravenous anti-biotics and wound debridement (Tr. 220-25, 318-22). On July 21, 2004, he recommended placement of a PICC line and cleaning out of her right calf wound, which

_____

[2]All references to the C.F.R. (Code of Federal Regulations), unless otherwise specified, are to the 2009 edition of part 404 of the regulations, which addresses claims under Title II of the Act. All of the cited regulations have parallel citations in part 416 of the regulations, which addresses claims under Title XVI of the Act.

he performed the following day.  On July 25, he noted her cellulitis resolved rapidly and discharged her (Tr. 226-31, 309).

On August 3, 2004, Plaintiff presented to the emergency room with complaints of painful, red, slightly increased swelling in her right leg.  Joshua Carson, M.D., found she was markedly obese and had unremarkable extremities, except for slightly tense skin, erythema, and tenderness in her right lower extremity.  She had a large surgical wound with erythema, but no active drainage.  A venous ultrasound study of the right lower extremity showed popliteal deep venous thrombosis.  Dr. Carson diagnosed deep venous thrombosis, ongoing treatment for wound infection, and recurrent cellulitis in the right lower extremity and admitted Plaintiff for further evaluation (Tr. 237-39).

On August 6 and 9, 2004, Plaintiff underwent wound and PICC line care, where it was noted her physical examinations were within normal limits and her pain was a zero on a ten-point scale (Tr. 401).  On August 11, 2004, Dr. Murray noted her calf wound was healing well with no surrounding cellulitis or purulence (Tr. 307).  Clinic notes dated from August 11 to August 23, 2004, showed Plaintiff underwent wound and PICC line care.  Examinations were within normal limits and Plaintiff rated her pain as a zero to one on a ten-point scale (Tr. 394, 396, 400).  From August 25 to August 30, 2004, clinic notes showed she underwent wound and PICC line care with normal examinations and pain of two to three on a ten-point scale (Tr. 391, 393).

From September 1 to September 7, 2004, Plaintiff underwent wound care and PICC line maintenance.  Examinations were within normal limits and she rated her pain as a zero on a ten-point scale (Tr. 390-91).  On September 10, 2004, Dr. Murray recommended infusion of Vancomycin (an anti-biotic) (Tr. 296).  Subsequent wound care clinic notes indicated Vancomycin infusions and examinations within normal limits with pain from zero to three on a ten-point scale (Tr. 380, 382-83).  On September 22, 2004, Dr. Murray found Plaintiff's wound

"look[ed] fine" and was "much smaller than several weeks ago. No surrounding cellulitis." He removed her PICC line (Tr. 291). From September 22 to 29, 2004, clinic notes showed Plaintiff underwent wound care and rated her pain as a zero to five on a ten-point scale (Tr. 375-76).

From October 1 to 6, 2004, wound care notes showed normal examinations and pain of zero to six on a ten-point scale (Tr. 372-73). On October 7, 2004, Dr. Murray found Plaintiff's wound was healing very well with an erythematous papular rash around it, which he felt would resolve "in a matter of days" with proper care (Tr. 288). Wound care clinic notes between October 8 and November 8, 2004, showed examinations within normal limits and pain between zero and four on a ten-point scale (Tr. 357-58, 360-61, 367, 369-70).

On November 9, 2004, Dr. Murray found that Plaintiff had a rash, which was "very superficial," but did not appear to be resolving (Tr. 282). On November 16, 2004, Dr. Murray found her skin problem was "resolving nicely" (Tr. 280). Wound care notes between November 16 and 30, 2004, showed normal examinations and pain of zero to five on a ten-point scale (Tr. 354, 356). Plaintiff presented for wound care on 19 occasions between December 3, 2004 and March 10, 2005. Examinations were within normal limits and she described her pain as ranging from zero to six on a ten-point scale (Tr. 322, 331-37, 339, 341, 351, 353). On March 15, 2005, Plaintiff underwent placement of another PICC line (Tr. 521). From March 18 to April 21, 2005, Plaintiff continued undergoing wound care with examinations within normal limits with pain of zero on a ten-point scale (Tr. 326-31).

On May 19, 2005, Richard Lafrance, M.D., examined Plaintiff. She reported she had a stroke, first occurring on April 23 with a left-sided headache. Due to the possible seriousness of Plaintiff's alleged medical condition she was admitted to the hospital. Shortly thereafter however, a head CT scan was negative, and she was discharged on April 25 with some right-sided weakness and difficulty with speech.

Following another episode of headaches she reported she was back to more normal speech, which Dr. Lafrance believed was always a little abnormal, hesitant, and stuttering. She reported she had her first headache at age 10. Dr. Lafrance found Plaintiff was obese and in no acute distress. There was no craniocerebral trauma. She was alert and oriented with good speech, although it did not flow well. She sometimes stopped, appeared to think, and had mild stutter. She had normal cranial nerves. Motor examination showed good strength, tone, and bulk in the upper and lower extremities. Reflexes, sensation, and coordination were normal. Gait was normal, with mild difficulty due to "very knocked knees." Dr. Lafrance diagnosed losses of neurologic deficit, possibly reflecting formal complicated migraine. He recommended MRI/MRA studies (Tr. 414-15).

On June 2, 2005, two electroencephalogram (EEG) studies showed some abnormalities (Tr. 410, 413). A brain MRI/MRA study showed no acute intracranial abnormality and fetal origin of the right posterior cerebral artery (Tr. 411). A carotid MRA study was unremarkable with no evidence of hemodynamically significant narrowing (Tr. 412). On June 8, 2005, Dr. Lafrance diagnosed excessive daytime drowsiness, abnormalities on EEG which may reflect drowsiness, and MRI study not demonstrating any clear stroke. He viewed her problem most likely as "complicated migraine" (Tr. 408-09). On August 3, 2005, Michele Mass, M.D., diagnosed complicated migraines and prescribed Topamax (an anti-convulsant) (Tr. 418).

On January 11, 2006, Kurt Lindsay, M.D., saw Plaintiff for headaches, which she stated occurred once per week during the previous two months. She had intact memory, normal fund of knowledge, and fluent/articulate language. She had occasional stuttering phenomenon. She had normal muscle bulk and tone, strength, and reflexes. Her coordination and sensation were intact. She had casual gait and could heel/toe and tandem walk without difficulty. Dr. Lindsay diagnosed complicated migraine with "some improvement" with Topamax (Tr. 609-10).

Plaintiff presented to Karen Niehaus, M.D., to establish care on January 30, 2006.

Dr. Niehaus found Plaintiff was normally developed and in no distress. She had no extremity amputations, deformities, or cyanosis and no significant ankle edema. Dr. Niehaus diagnosed migraines with history of paralysis and prescribed medications (Tr. 513-14). On April 19, 2006, Dr. Niehaus diagnosed diabetes and prescribed medication (Tr. 508-09).

On May 31, 2006, Plaintiff presented to Dr. Lindsay and reported one headache over the past four to six weeks, which was substantially decreased from her description at previous visits. She stated she had no dysphagia during her headaches over the previous two to three episodes. Dr. Lindsay found she was alert and oriented with intact memory and normal fund of knowledge. Her language was fluent and articulate. Motor exam revealed normal bulk and tone without pronator drift. She had full extremity strength, normal reflexes, and grossly intact sensation. She had casual gait with normal arm swing. She could heel and toe walk without difficulty. Dr. Lindsay diagnosed complicated migraines improved with Topamax and Fioricet (a muscle relaxer) and continued her medications (Tr. 624-25).

On August 4, 2006, Plaintiff presented to the emergency room with left calf cellulitis after "walking quite a bit lately." Michael Adams, a nurse practitioner, noted a Doppler ultrasound showed no evidence of deep venous thrombosis or popliteal cyst, but a non-occlusive clot or wall thrombus could not be ruled out (Tr. 440-43, 444). The next day, Mr. Adams diagnosed superficial venous thromboembolism. He recommended that Plaintiff keep her leg elevated until she saw her doctor (Tr. 434-35).

On August 7, 2006, Plaintiff presented to the emergency room with complaints of leg pain. William Fraser, M.D., found Plaintiff had good equal bilateral grip strength. She moved all four limbs to command. She had normal sensation in both upper extremities. She was normal to touch in the lower extremities. She had slight tingling in her left foot and ankle. She had no erythema on either thigh. The tissue turgor and muscle in her thighs were normal. Her calves were very large. She had superficial skin erythema, redness, and tenderness in her left

calf.  A Doppler venous study showed clear femoral veins.  Dr. Fraser diagnosed superficial

thrombophlebitis in her leg and a left knee Baker's cyst and prescribed medications (Tr. 421-24,

433).  That same day, Plaintiff saw Erling Oksenholt, M.D.  Dr. Oksenholt noted Plaintiff

presented in a wheelchair and diagnosed deep venous thrombosis and prescribed medications.

He asked Plaintiff to elevate her leg (Tr. 498-99).

Two days later, Plaintiff presented to the emergency room with left leg pain.  Dr. Carson

noted she had not been elevating her leg as instructed, stating it "hurt[ ] too much" and would

not elaborate further on why she had not been compliant in this fashion.  Dr. Carson found her

left lower extremity remained dependent even when he instructed her otherwise.  She stated "it

hurt[] too much" to elevate it, and he explained to her this was extremely necessary regardless

and he would support her leg with pillows, etc., and do whatever was necessary.  Her left lower

extremity appeared edematous.  The skin of her left lower extremity was slightly tense with

some diffuse tenderness.  She had mild dorsal pedal edema on the left.  She was had intact

neurovascular functioning.  Dr. Carson diagnosed large dissecting Baker's cyst with superficial

thrombophlebitis on the left, poor compliance with elevation, inadequate analgesia with opioids,

and morbid obesity and admitted her for evaluation (Tr. 475-77).

David Long, M.D., evaluated Plaintiff.  He found she was fairly lethargic and fell asleep

mid-sentence.  He found she weighed 343 pounds and had no extremity clubbing or cyanosis.

She had mild edema on the right, 2+ edema on the left, tenderness in the popliteal fossa/posterior

calf area, and mild blotchy erythema.  A left lower extremity venous ultrasound showed no

evidence of deep venous thrombosis from the knee up, but a large mass, likely representing a

large popliteal cyst.  Dr. Long diagnosed left leg pain secondary to a mass most consistent with a

Baker's cyst, diabetes, atypical migraines, and chronic anxiety and depression.  He

recommended a left knee MRI study (Tr. 472-74, 500), which showed a large parapopliteal

mass, most consistent with popliteal cyst, medium sized joint effusion, and no gross evidence of

internal derangement (Tr. 485, 497). A left knee x-ray showed no gross fractures and mild degenerative joint disease (Tr. 486, 496). Between August 11 and 16, Plaintiff underwent physical therapy (Tr. 468-71). On August 18, 2006, Bryan Harris, M.D., noted Plaintiff's pain was "really out of proportion" to examinations in the hospital. He diagnosed cellulitis, ruptured Baker's cyst, anemia, and type II diabetes. He prescribed medications, and discharged Plaintiff (Tr. 466-67).

On September 29, 2006, Dr. Niehaus found no extremity amputations, deformities, or cyanosis, slight edema, and pain in the left calf area without discoloration or visible swelling. She diagnosed left leg cellulitis and Baker cyst resolving nicely and anemia of uncertain etiology, most likely from bleeding into the leg. She prescribed medications (Tr. 488-89). On October 21, 2006, a left lower extremity MRI study showed findings consistent with soft tissue hematoma with subsequent infection and spread of infection to the musculature with muscle abscess. Muscle pathology could also be related to diabetic myonecrosis (Tr. 555-56). On October 5, 2006, Dr. Niehaus diagnosed controlled diabetes mellitus, controlled hypertension, and foot paralysis from a Baker's cyst rupture (Tr. 668-69).

On October 22, 2006, Plaintiff presented to the emergency room with complaints of leg pain. Paul Hochfeld, M.D., found thickened legs and calf tenderness. There was no erythema. She had diminished sensation in the plantar aspect of the left foot. She had intact, active, and good strength on dorsiflexion and plantar flexion of the great toes bilaterally. An ultrasound was abnormal in that it showed a complex structure in the popliteal fossa with hemorrhage, certainly a possibility that included Baker's cyst, sarcoma, or other muscle tumor. He diagnosed calf pain (Tr. 545-47, 552). A left lower extremity MRI study showed large abscess in the deep fascia of the left leg superficial to the musculature and possible necrosis (Tr. 548). Leslie O'Meara, M.D., noted Plaintiff was treated the previous August and given a walker, which she had been using "all the time" for the previous week." Dr. O'Meara diagnosed complex mass in the left leg,

obstructive sleep apnea, type II diabetes under "good control," morbid obesity, and hyperlipidemia (Tr. 542-44). David Faddis, M.D., evaluated Plaintiff and diagnosed resolving hematoma versus possible infected hematoma and abscess, the etiology of which was unclear (Tr. 549-50). The following day, Dr. Faddis noted Plaintiff had been using a walker during the previous two months. She had full mobility of the hips and knees with no instability of the knees. She had a well-healed scar on the proximal medial aspect of the right lower extremity. On the left, she had active dorsiflexion bilaterally. She had symmetric digital dorsiflexion bilaterally and did not have plantar flexion on the left. Sensation was absent on the plantar aspect of the foot. Dr. Faddis diagnosed mass and dysfunction of the posterior tibial nerve. He recommended aspiration of the mass (Tr. 538-41, 553-54).

On November 1, 2006, Ronald Duvall, Ph.D., examined Plaintiff at the request of the Commissioner. Plaintiff complained of memory loss due to complex migraines, depression, and anxiety. Plaintiff reported that, when she did not have a migraine, she did light cooking, did some dishes, and helped her daughter do laundry. She said she had to use a walker, even in her house, and was thus unable to do more of the chores. She said she did not drive. She said she watched television and movies most of the day. Rarely, she walked down to the dock. She tried to read. Dr. Duvall found she presented using a walker, ambulating very slowly. Her manner was rather prickly. Her speech was "very odd: she stammered in exactly the same manner on several different words 'tuh-tuh-tuh-three' and 'fu-fu-fu-four,' always three misses before saying the word properly." This seemed an unlikely stammer and more an unsophisticated person's idea of a speech problem or stammer. Her stammer also appeared and disappeared without apparent cause or her notice. She also initially had word-finding problems, but this disappeared abruptly about 5-10 minutes into the interview. Her grammar was bad and full of solecisms. Her clothing was ragged and her hygiene poor. She showed "no non-verbal pain behavior at all–none." This was inconsistent with her many reports of constant pain and weakness. Her

memory appeared quite intact. She was able to pay attention and concentrate well enough to follow the conversation thread. There were no signs of psychotic difficulties with her thought processes or content. She was very somatic in her talk and seemed unable to respond with or describe emotional reactions to life events. She complained of anxiety and depression, but her affect was inconsistent with these reports.

Dr. Duvall administered the Wechsler Adult Intelligence Survey–Third Edition (WAIS-III), which showed a verbal IQ of 71, performance IQ of 72, and full scale IQ of 69. He also administered the Test of Memory Malingering (TOMM), which suggested less than optimal effort. Dr. Duvall diagnosed malingering (cognitive deficits), dysthymia (mild-moderate depression), atypical somatoform disorder, and dependent personality disorder. He assigned a GAF score of 55.[3] Dr. Duvall summarized that Plaintiff's WAIS-III results were very unlikely for someone who reportedly obtained a 3.7 GPA through high school. He believed her low IQ scores reflected a persistent lack of effort on the testing. There was ample evidence Plaintiff exaggerated her memory impairment, motivated by remaining in the "disabled patient role with her family" as well as to obtain Social Security benefits. The TOMM results supported this perception. He stated Plaintiff's core diagnoses were atypical somatoform disorder and dependent personality disorder, noting "she ha[d] so many somatic complaints that sorting the genuine from the exaggerate[d] ones [was] bound to be challenging for her physician." He said "the data she reported today [was] inconsistent and unreliable. Results of the cognitive testing, which was clearly exaggerated, cast[ed] doubt on the rest of the information she provided." Her work capacity was "unknown," and "she [was] a long way from working, particularly in her attitudes." He saw "no reason she could not perform some type of work" (Tr. 561-67).

_____

[3]A GAF (Global Assessment of Functioning) score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (*DSM-IV*) (4th ed. 1994).

On November 7, 2006, Plaintiff reported one headache every six weeks with episodes of dysarthria in about half of them. Dr. Lindsay found she had fluent and articulate language with minor slurring. Motor examination showed normal bulk and tone without pronator drift and full strength in all extremities. Reflexes were normal and coordination was intact. Dr. Lindsay diagnosed complicated migraines and continued Plaintiff's Topamax (Tr. 623-24). On November 20, 2006, Cecilia Keller, M.D., found Plaintiff was alert and oriented times three with intact memory/concentration and no evidence of receptive or expressive aphasia. Motor examination showed no fasciculation, tremors, or atrophy. She had normal tone without evidence of rigidity. She had difficulties with plantar flexion and flexion of the toes in the left foot. All other muscle groups had 5/5 strength. Reflexes were normal. Ambulation was limited due to pain. She had difficulties heel/toe walking. She had intact sensation and coordination. She had spasms in the cervical and lumbar paraspinous muscles, limited range of motion due to pain, and edema in the lower extremities. Dr. Keller diagnosed left calf hematoma leading to weakness of plantar flexion and dysesthesias in the foot due to tibial nerve injury (Tr. 570-71).

On November 14, 2006, Bill Hennings, Ph.D., a State agency psychologist, reviewed the medical evidence and found Plaintiff had moderate restrictions on her activities of daily living, social functioning, concentration, persistence, and pace and no episodes of decompensation (Tr. 572-85). He stated she had moderate limitations on her ability to carry out detailed instructions and interact appropriately with the general public. He stated she could understand and remember simple, routine work tasks requiring limited contact with the public (Tr. 586-89). On November 27, 2006, Neil Burner, M.D., a State agency physician, found Plaintiff could perform light work but should avoid concentrated exposure to hazards (Tr. 590-97).

On December 21, 2006, Plaintiff told Dr. Niehaus her depression was worse and she used a walker. Dr. Niehaus diagnosed headaches, controlled hypertension, diabetes mellitus, and depression and adjusted Plaintiff's medications (Tr. 662-63). The following month, Dr. Keller

found Plaintiff had problems with flexion, dorsiflexion, and lateral leg movement. She had depressed reflexes. Her gait was impaired and she needed a walker. She diagnosed recent weakness of the lower extremity secondary to hematoma (Tr. 629-30).

On February 7, 2007, Paul Rethinger, Ph.D., a State agency psychologist, reviewed the medical evidence and affirmed Dr. Hennings' November 2006 findings (Tr. 605). The following day, Martin Kehrli, M.D., a State agency physician, reviewed the medical evidence and affirmed Dr. Burner's November 2006 findings (Tr. 606). On February 15, 2007, Plaintiff told Dr. Lindsay she had headaches once every four to six weeks. One week previously, she had difficulty seeing out of her right eye. She saw an optometrist who told her that her optic disc was "swollen." Dr. Lindsay found she had fluent and articulate language with minor slurring. She had normal cranial nerves, including visual fields full to finger counting and grossly normal visual acuity. She had normal bulk and tone without pronator drift and 5/5 strength in all extremities. She had normal reflexes and coordination. Dr. Lindsay diagnosed complicated migraines "much improved" with Topamax and visual field deficit by history (Tr. 621-22).

On March 1, 2007, David Dance, M.D., examined Plaintiff for complaints of visual loss. He diagnosed functional visual field deficit. With regard to his examination results, he stated he was "not sure if th[ese] correlate[d] with malingering or not, but [he thought] that th[ese] were suspicious of it" (Tr. 616-21, 632-37). On April 11, 2007, Dr. Niehaus diagnosed controlled diabetes and hypertension and prescribed medications (Tr. 656-57). The following month, she reported to Dr. Lindsay she had one headache in six weeks. Dr. Lindsay found she had fluent and articulate language with minor slurring. Motor examination showed normal bulk and tone without pronator drift and full extremity strength. Reflexes were normal and coordination was intact. Dr. Lindsay diagnosed complicated migraines improved with Topamax (Tr. 615-16).

On June 25, 2007, Plaintiff reported headaches and speech impediment to Dr. Lindsay. She was not there with an appointment nor did she want him to do anything about the headache

or speech difficulty as it was the same as it had been in the past. Dr. Lindsay found her speech "[was] difficult to understand like she [was] trying to have an accent." He diagnosed speech impediment from headaches per patient (Tr. 652-53). One month later, Plaintiff reported she had three headaches in four to five weeks. Dr. Lindsay found she had fluent and articulate language with no slurring. She had normal strength, reflexes, and coordination. Dr. Lindsay diagnosed complicated migraines under moderate control, much improved with Topamax (Tr. 613-14).

On October 17, 2007, Dr. Niehaus noted Plaintiff's speech was slurred and high pitched. She diagnosed controlled diabetes, controlled hypertension, and hyperlipidemia and continued Plaintiff's medications (Tr. 646-47). The following month, Plaintiff reported foot coldness and hypersensitivity and ear pain. She reported "doing a lot more walking." Dr. Niehaus diagnosed foot and ear pain of uncertain etiology (Tr. 644-45).

On January 17, 2008, Dr. Niehaus noted Plaintiff had been in the hospital for right sided weakness, disorientation, and inability to walk. She was also diagnosed with migraine headaches after a normal CT scan. Dr. Niehaus diagnosed stable complex migraines, controlled depression, and diabetes mellitus (Tr. 642-43). The following month, Plaintiff said she had two to three headaches in January, but overall, she had one headache every two months. Dr. Lindsay found her language was fluent and articulate with no slurring. Motor examination, strength, reflexes, and coordination were all normal. Dr. Lindsay diagnosed complicated migraines under moderate control, much improved with medications (Tr. 610-13).

On March 26, 2008, David Truhn, Psy.D., examined Plaintiff. Dr. Truhn noted her speech was marked by speaking in an unusual cadence and sounding as if she had a thick tongue and almost childlike. She would say "F, I, E" instead of saying five of "T, R, E, E" instead of saying three. Often, she elongated words and emphasized unusual syllables. She repeated words and had a dramatic presentation. She brought a cane to the appointment but did not seem to use it very much. She said she had many friends at church, which she attended on a weekly basis.

She spent her time watching television and walking up to a quarter of a mile. She went to the library occasionally. She said she helped do some of the cooking. She said she grocery shopped with her husband. On the WAIS-III, Plaintiff obtained a verbal IQ of 86, a performance IQ of 84, and a full scale IQ of 84. On the Comprehensive Trail Making Test, her scores indicated possible cognitive disorder. On the Minnesota Multiphasic Personality Inventory, her profile was invalid as similar scores indicated "exaggerated symptoms as a cry for help." Dr. Truhn diagnosed pain disorder associated with both psychological factors and general medical condition, social phobia, dysthymia, conversion disorder, and dependent personality disorder and assigned a GAF score of 43.[4] Dr. Truhn stated Plaintiff was not malingering, but she exaggerated symptoms and exacerbated the symptoms of her complicated migraine headaches probably in service to the dependent personality disorder and as a reaction to stress, anxiety, and depression. He said there seemed to be evidence she malingered cognitive deficits. He recommended mental health treatment and psychotherapy. He stated her ability to function in the workplace seemed to be poor and her ability to maintain any consistent work performance seemed to be severely impaired. He stated her prognosis was poor (Tr. 675-84).

Dr. Truhn stated Plaintiff had moderate limitations on remembering locations and work-like procedures, understanding/carrying out short and simple instructions, making simple work-related decisions, asking simple questions, responding to changes in a work setting, setting goals, and making plans. He said she had moderately severe limitations on her abilities to understand, remember, and carry out detailed instructions, interact appropriately with the general public, and maintain socially appropriate behavior. He stated she had severe limitations on her abilities to maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine, work in coordination with or in proximity to others, complete a normal

[4]A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*, *see supra* note 3.

workday and workweek, accept instructions, get along with coworkers, and travel to unfamiliar places. He said she had substantial loss of ability to understand, remember, and carry out simple instructions, and respond appropriately to supervision, co-workers, and usual work situations. He said she was disabled as of June 1, 2004 (Tr. 685-88).

On June 6, 2008, Joan Barry-Gertz, M.A., a counselor, indicated she saw Plaintiff three times since April 2008 (Tr. 689-90). She diagnosed dysthymic disorder or major depressive disorder, pain disorder with psychological factors and general medical condition, social phobia, and dependent personality disorder. She assigned a GAF score of 50. She said vocational activities would exacerbate her symptoms. She said she concurred with Dr. Truhn's report with respect to her abilities to understand/remember detailed instructions, maintain attention, perform activities within a schedule, sustain a routine, work in coordination with others, complete a workday and work week, interact with the public, accept instructions, get along with co-workers, maintain cleanliness, respond to changes, and travel to unfamiliar places (Tr. 691-93).

**(C)    Other Evidence and Plaintiff's Hearing Testimony.**

In an undated function report, Plaintiff stated she helped her daughter fix dinner, did word searches, and took care of her dog. She was in constant pain and required assistance with her personal care due to imbalance and remembering to take medications. She made a full meal maybe once a week. She went outside two to three times per day. She grocery shopped once per month. She went to church. She said she walked thirty feet before needing to rest and required a walker (Tr. 173-80). Plaintiff's husband submitted a function report stating essentially the same limitations on September 20, 2006 (Tr. 150-57).

On May 23, 2008, Susan Trachsel, Plaintiff's case manager at the Oregon Department of Human Services, stated Plaintiff had a walker, then a cane. She said her speech was significantly impaired when she had migraines. She repeated herself and slurred her words. She said this became more frequent during the previous year. She did not believe Plaintiff was trying

to make her speech sound slurred, repetitive, or delayed (Tr. 200).

Plaintiff testified that she had two to three migraines per month and headaches constantly as of June 2005. Vicodin lessened, but did not relieve, the pain. Topamax helped, but she continued to have two migraines per month, each lasting three to four days (Tr. 16, 22-25). She needed to go into a dark room and sleep (Tr. 25). In 2006, when she was doing well, she was able to be on the computer, go walking some, and volunteer at her daughter's school (Tr. 27). In 2006, she was unable to do anything during a migraine. Migraines caused her to stutter, slurred speech, have blurred vision in the right eye, and to have short-term memory loss (Tr. 29-30, 33). With increased Topamax, she had two to three migraines per month each for two days (Tr. 37-38). She said she could not work due to leg problems during the previous two years (Tr. 12). She said it took a year to recover from her lipoma removal surgery (Tr. 13-15). She said the pain from her wound was a five and six on a ten point scale, sometimes flaring to an eight or nine (Tr. 15). She was in bed a lot from 2004-2005 because her leg was supposed to be elevated (Tr. 16). She said she was in the hospital a lot that year (Tr. 13). She said when she had a hematoma in her left leg, she used a walker and a cane (Tr. 38). Her left leg was sensitive to touch, became "ice cold," and had poor blood circulation. She elevated her leg for at least a couple of hours per day (Tr. 38-39).

**(D)    Vocational Expert Testimony.**

The ALJ asked Mark McGowan, a vocational expert, to assume a hypothetical individual of Plaintiff's age, education, and work experience as follows:

> This individual can lift 10 pounds frequently, 20 pounds occasionally, and I feel the DDS was a little bit optimistic in terms of her ability to stand and walk. I'm going to limit her [so] she can sit six hours but she can only stand and walk two hours total during the day, I mean excuse me, four hours total during the day and it should be only 30 minutes continuous on her feet. She would need to avoid concentrated exposure to hazards. So, that'd [sic] be no ropes, ladders, scaffolding, hazardous, you know, machinery. Driving a car is okay but something where the use of narcotic medications might dull her response time. I wouldn't want her operating saws and that sort of hazardous machinery.

There should be no frequent interaction with the general public and she would
be limited to simple, routine tasks and the reason I'm not going with the DDS
in terms of ability to stand and walk and be on her feet is the problem she's had
with her legs as well as the weight that she carries. I think those are not
consistent with that much activity on her legs, and I'm going to also add if she is
sitting and would need to change position at least every hour for few minutes.

(Tr. 42-43). Mr. McGowan testified that such an individual could perform the light, unskilled

job of office helper and the sedentary, unskilled jobs of surveillance system monitor and

semi-conductor assembler (Tr. 43-45).

## DISCUSSION

**(A)**     **Legal Standard.**

Under the Social Security Act, "disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A). The Act further provides that an individual shall be determined to be disabled

"only if [her] physical or mental impairments are of such severity that [she] is not only unable to

do [her] previous work but cannot, considering [her] age, education, and work experience,

engage in any other kind of substantial gainful activity which exists in the national economy."

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

A person seeking Social Security benefits bears the burden of proving that because of her

disability, she is unable to perform her prior work activity. *See Miller v. Chater*, 99 F.3d 972,

975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). Once the

claimant establishes that she cannot perform her past relevant work, the burden shifts to the

Commissioner to prove that the claimant retains the ability to do other work and that jobs which

she can perform exist in the national economy. *See Saleem v. Chater*, 86 F.3d 176, 178 (10th

Cir. 1996); *Miller*, 99 F.3d at 975.

-17-

The Commissioner's decision must be supported by substantial evidence. *See Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Perales*, 402 U.S. at 390. In reviewing the Commissioner's decision, the Court may not re-weigh the evidence or substitute its judgment for that of the agency. *See Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996). The Court also reviews the Commissioner's decision to determine whether the correct legal standards were applied. *See Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)     A person who is working is not disabled. *See* 20 C.F.R. § 404.1520(b).

(2)     A person who does not have an impairment or combination or impairments severe enough to limit her ability to do basic work activities is not disabled. *See Id.* § 404.1520(c).

(3)     A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, is conclusively presumed to be disabled. *See id* § 404.1520(d).

(4)     A person who is able to perform work he has done in the past is not disabled. *See id.* § 404.1520(e).

(5)     A person whose impairment precludes performance of past work is disabled unless the Commissioner demonstrates that the person can perform other work available in the national economy. Factors to be considered are age, education, past work experience, and residual functional capacity. *See id.* § 404.1520(f).

**(B)**     **<u>The ALJ's Decision.</u>**

In her decision, the ALJ followed the five-step sequential evaluation required by the regulations for evaluating disability claims. At step one, she found Plaintiff had not engaged in substantial gainful activity since her alleged onset date (Tr. 59). At step two, she found Plaintiff

had obesity, diabetes mellitus, depressive disorder, and personality disorder, impairments which were "severe" pursuant to the regulations (Tr. 59-61). At step three, she found Plaintiff did not have an impairment that met or medically equaled a Listing (Tr. 61). At step four, she found Plaintiff had the residual functional capacity for light work qualified by the following restrictions:

- Lifting and/or carrying frequently up to 10 pounds and occasionally up to 20 pounds;
- Sitting one hour continuously up to six hours out of eight hours;
- Standing and/or walking thirty minutes continuously up to four hours out of eight hours;
- Having no exposure to hazards, such as ropes, ladders, scaffolds, machinery, or saws; and
- Only simple, routine tasks and no frequent interaction with the general public.

(Tr. 61-68). The ALJ found Plaintiff's residual functional capacity precluded her from performing her past relevant work (Tr. 68). At step five, relying on vocational expert testimony, the ALJ found Plaintiff could perform a significant number of jobs in the national economy, including the jobs of office helper, surveillance system monitor, and semi-conductor assembler (Tr. 68-69). Therefore, she found Plaintiff was not disabled (Tr. 69).

Plaintiff makes six principal arguments in support of her disability claim: (1) the ALJ erred by not finding that her headaches were a severe impairment (Pl.'s Br. at 13-14); (2) the ALJ failed to comply with Social Security Ruling (SSR) 02-1p in considering the impact of her obesity (Pl.'s Br. at 14-15); (3) the ALJ failed to properly consider whether her impairments met or equaled a Listing (Pl.'s Br. at 15-17); (4) the ALJ failed to properly evaluate the opinions of Dr. Truhn (Pl.'s Br. at 18-19); (5) the ALJ improperly evaluated the credibility of her subjective complaints (Pl.'s Br. at 19-21); and (6) the ALJ improperly determined her residual functional capacity (Pl.'s Br. at 21-21). The Court addresses each argument in turn.

**(C)     Severity of Plaintiff's Headaches.**

An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. *See Hinkle*, 132 F.3d at 1352; 20 C.F.R. § 404.1521(a). A physical or mental impairment must be established by medical evidence and last for a continuous period

of at least twelve months. *See* 20 C.F.R. §§ 404.1508, 404.1509. It is the claimant's burden to show she has a severe impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 146, note 5 (1987); *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997) (citing 20 C.F.R. § 404.1520(c)). Plaintiff argues that the ALJ erred by not finding that her headaches were a severe impairment (Pl.'s Br. at 13-14). The Court disagrees.

The ALJ found the objective medical evidence did not support a finding that Plaintiff's headaches were a severe impairment (Tr. 60). In May 2005, a head CT scan was negative (Tr. 414-15). In June 2005, a brain MRI/MRA study showed no acute intracranial abnormality (Tr. 411). In January 2006, she stated that her headaches occurred once per week during the previous two months (Tr. 609-10). In May 2006, she reported one headache over the past four to six weeks, which was substantially decreased from her description at previous visits (Tr. 624-25). In November 2006 and May 2007, Dr. Lindsay noted that Plaintiff had one headache every six weeks (Tr. 615-16, 623-24). In July 2007, she reported three headaches in four to five weeks (Tr. 613-14), and in January 2008, overall, she had one headache every two months (Tr. 610-13).

The ALJ also found, there were significant gaps in treatment for Plaintiff's allegedly severe headaches (Tr. 60). Between January and November 2006, she never complained of and never saw a medical provider for a headache except for once in May 2006 (Tr. 421-24, 433-35, 440-44, 466-77, 485-86, 488-89, 496-600, 508-09, 513-14, 530, 536-37, 543-50, 552-56, 560-67, 609-10, 623-25, 668-69). Plaintiff did not present to any medical source with complaints of a headache between February and May 2007 (Tr. 615-16, 621-22). *See, e.g., Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (frequency of medical contacts and extensiveness of attempts (medical or nonmedical) to obtain relief may be considered in evaluating credibility).

The ALJ further found the medical evidence showed that Plaintiff's headaches were improved with medications (Tr. 60). On six occasions between January 2006 and January 2008, Dr. Lindsay noted improvement in Plaintiff's headaches with Topamax (Tr. 609-16, 621-22,

624-25).  *See, e.g., Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995) (The ALJ could consider the extent to which a claimant's impairment was controlled by medications in evaluating her credibility).

Other inconsistencies also undermined Plaintiff's allegations of severe migraine headaches (Tr. 60).  While she testified at the hearing in June 2008 that she had headaches a couple of times per month (Tr. 37), she told Dr. Lindsay in February 2008 that she overall had one headache every two months (Tr. 610).  *See, e.g., Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (inconsistencies supported a finding that Ms. Bassett's testimony was not credible).

Although the ALJ did not specifically enumerate Plaintiff's migraine headaches as a severe impairment, the Court finds she accounted for Plaintiff's migraine headaches by limiting her to "simple routine tasks and no frequent interaction with the general public" (Tr. 61-68). SSR 96-8p ("In assessing [residual functional capacity], the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").  Thus, if the ALJ erred in not specifically enumerating Plaintiff's migraine headaches as a severe impairment, it was harmless.  *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("Nevertheless any error [in not finding  a specific impairment 'severe' at step two] here became harmless when the ALJ reached the proper conclusion that Ms. Carpenter would not be denied benefits conclusively at step two and proceeding to the next step of the evaluation sequence."); *see Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-35 (10th Cir. 2005) (applying principle of harmless error to step three determination); *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) ("[I]t nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way").

**(D)** **SSR 02-1p and Considering the Impact of Plaintiff's Obesity on Her Ability to Work.**

SSR 02-1p states that obesity can cause limitations on any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions such as climbing, balance, stooping, and crouching. The ability to manipulate and to tolerate extreme heat, humidity, or hazards may be affected. *See* SSR 02-1p. "The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning." *Id.* SSR 02-1p states an assessment should be made of the effects obesity has upon a claimant's ability to perform routine movement and necessary physical activity within the work environment, noting the combined effects of obesity with other impairments may be greater than might be expected without obesity. As with any other impairment, an ALJ must explain how she reached her conclusions on whether obesity caused any physical or mental limitations. *See id.* Plaintiff argues that the ALJ failed to comply with SSR 02-1p by not considering the impact of her obesity on her ability to work (Pl.'s Br. at 14-15).

However, the ALJ expressly considered Plaintiff's obesity and found it to be a severe impairment (Tr. 59-61). The ALJ also expressly found that Plaintiff's obesity was "wholly addressed by a limitation to no more than light work" (Tr. 66). Specifically, she found that her obesity and diabetes limited her to light work with sitting one hour continuously up to six of eight hours and standing/walking 30 minutes continuously up to four out of eight hours (Tr. 61-68). The ALJ expressly considered SSR 02-1p and found that no medical source recommended aggressive treatment for Plaintiff's obesity beyond losing weight and dieting (Tr. 66). The ALJ found that her co-morbid high blood pressure was stable on medications (Tr. 646-47, 656-57, 662-63, 668-69). She also found that her history of right leg deep vein

thrombosis (Tr. 237-39, 421-24, 433-35, 498-99), history of right leg lipoma excision exacerbated by cellulitis (Tr. 220-31, 280, 282, 288, 260-91, 296, 307, 309, 313-37, 339, 341, 351, 353-58, 367, 369-70, 372-73, 375-76, 380, 382-83, 390-94, 396, 400-01, 521) and history of ruptured Baker's cyst resolved within 12 months (Tr. 466-67, 472-77, 485, 488-89, 497, 500, 538-47, 549-50, 552-54).  The ALJ also found that there was no evidence that Plaintiff's obesity limited her range of motion or otherwise independently reduced her ability to function (Tr. 66).

Plaintiff next argues that the ALJ did not consider her sleep apnea in evaluating her obesity under SSR 02-1p (Pl.'s Br. at 14-15).  The ALJ, however, expressly found that while Plaintiff sought treatment for her sleep apnea prior to her alleged onset date, there were no notes documenting treatment for sleep apnea for several years after that (Tr. 449-51, 454-62, 542-44, 628-29).  The ALJ also considered all of Plaintiff's impairments, both severe and non-severe, in evaluating her residual functional capacity (Tr. 61-68).  She accounted for her symptoms related to sleep apnea, which may have included fatigue, by limiting her to "simple routine tasks ans no frequent interaction with the general public" (Tr. 61-68).  *See* SSR 96-8p.  If the ALJ erred by not specifically listing sleep apnea as a "severe" impairment, it was harmless.  *See Carpenter*, 537 F.3d at 1266; *Fischer-Ross v. Barnhart*, 431 F.3d at 733-35; *Allen*, 357 F.3d at 1145.

**(E)** **Listing of Impairments.**

A claimant is presumptively disabled when he has an impairment or combination of impairments that meets or equals a Listing.  *See* 20 C.F.R. § 404.1520(d).  The Listing of Impairments, found at 20 C.F.R. pt. 404, subpt. P, app. 1, describes impairments considered severe enough to prevent an individual from doing an substantial gainful activity.  *See id.* § 404.1525(a).

Plaintiff argues that, in finding her impairments did not meet or equal a Listing, the ALJ only reviewed selected portions of the record that seemed to support a finding of non-disability (Pl.'s Br. at 16).  But, a review of the ALJ's decision undermines Plaintiff's

argument. The ALJ discussed the medical evidence in detail in 13 paragraphs over nine pages

(Tr. 59-68).

Next, Plaintiff asserts her impairments met Listing §§ 12.04 and 12.08 (Pl.'s Br. at

16-17). Listing § 12.04, affective disorders, provides in relevant part as follows:

> 12.04  Affective Disorders . . .
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>   A.  Medically documented persistence, either continuous or intermittent, of one of the following:
>   1.  Depressive syndrome characterized by at least four of the following . . .
>   2.  Manic syndrome characterized by at least three of the following . . .
>   3.  Bipolar syndrome . . .
>   AND
>   B.  Resulting in at least two of the following:
>   1.  Marked restriction of activities of daily living; or
>   2.  Marked difficulties in maintaining social functioning;
>   3.  Marked difficulties in maintaining concentration, persistence, or pace; or
>   4.  Repeated episodes of decompensation, each of extended duration;
>   OR
>   C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support, and one of the following:
>   1.  Repeated episodes of decompensation, each of extended duration; or
>   2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>   3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Listing § 12.08, personality disorders, provides in relevant part as follows:

> 12.08 Personality Disorders . . .
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied:
>   A.  Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
>   1.  Seclusiveness or autistic thinking; or
>   2.  Pathologically inappropriate suspiciousness or hostility; or
>   3.  Oddities of thought, perception, speech, and behavior; or
>   4.  Persistent disturbances or mood or affect; or

5.  Pathological dependence, passivity, or aggressivity; or
  6.  Intense and unstable interpersonal relationships and impulsive and
damaging behavior . . .

*Id.* § 12.08.  Listing § 12.08B includes the same requirements found in Listing § 12.04B.  *See id.*

Although Plaintiff's impairment may have met some of the criteria for Listing §§ 12.04A or 12.08A, the medical evidence did not show that her impairments met the requirements of §§ 12.04B or 12.08B.  As the ALJ found, Plaintiff did not experience marked limitations on her activities of daily living (Tr. 61).  She reported to Dr. Duvall that, when she did not have a migraine, she did light cooking, did some dishes, and helped her daughter do laundry.  She also told him that she walked down to the dock (Tr. 561-67).  She told Dr. Truhn that she attended church weekly.  She said she spent her time watching television and walking up to a quarter of a mile.  She also stated that she went to the library occasionally and helped do some of the cooking.  She said she grocery shopped with her husband (Tr. 675-84).  She stated that she helped her daughter fix dinner, did word searches, took care of her dog, and went outside two to three times per day (Tr. 150-57, 173-80).

The ALJ found the medical evidence did not show that Plaintiff experienced marked difficulties in social functioning (Tr. 61).  She told Dr. Truhn that she had many friends at church which she attended weekly (Tr. 173-80, 675-84).  Additionally, the ALJ found the medical evidence did not show that Plaintiff had marked limitations in concentration, persistence, or pace (Tr. 61).  Dr. Duvall noted that Plaintiff did light cooking, did some dishes, helped her daughter do laundry, watched television, and tried to read.  Dr. Duvall stated Plaintiff could pay attention and concentrate well enough to follow their conversation and found she had no difficulties with thought processes or content (Tr. 561-67).  Dr. Truhn noted that she went to the library occasionally, cooked, and grocery shopped (Tr. 674-84).  Plaintiff stated that she did word searches (Tr. 173-80).

There is no evidence in the record that Plaintiff experienced any episodes of decompensation of an extended duration. There is also no evidence that Plaintiff had a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate.

The ALJ's finding that Plaintiff did not have an impairment that met Listing §§ 12.04 or 12.08 was further supported by the findings of Drs. Hennings and Rethinger, the State agency psychologists who reviewed the medical evidence and found that she did not have an impairment that met a Listing (Tr. 572-85, 605). *Ostronski v. Chater*, 94 F.3d 413, 417 (8th Cir. 1996) ("The ALJ is entitled to rely on the opinions of reviewing physicians when considering whether the claimant meets the requirements of a listed impairment.").

In sum, "[f]or a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, Plaintiff failed to demonstrate that her impairments met all the requirements of Listing §§ 12.04B, 12.08B, or 12.04C.

Next, Plaintiff argues that the ALJ did not consider her impairments in combination in determining whether her impairments met or equaled a Listing (Pl.'s Br. at 17). However, an ALJ's separate discussion of a claimant's impairments and the other evidence of record is sufficient to show that she adequately considered the claimant's impairments in combination. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) (ALJ sufficiently considered impairments in combination when he separately discussed each impairment, the complaints of pain and the daily activities, and made a finding that a Social Security disability claimant's impairments did not prevent her from performing her past relevant work). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Id.* (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)). In *Eggleston v.*

*Bowen*, the Tenth Circuit concluded that an ALJ's analysis of a claimant's various impairments was sufficient:

> Finally, Eggleston argues that the ALJ did not consider the combined effects of his impairments. The ALJ's opinion addresses Eggleston's various impairments, and we find nothing to suggest that they were not properly considered. The ALJ did not err.

851 F.2d 1244, 1247 (10th Cir. 1988).

Here, the ALJ stated that she carefully considered all of the evidence (Tr. 58), specifically noting that she considered Plaintiff's impairments in combination in determining whether they met or medically equaled a Listing (Tr. 61). There is nothing in the record to indicate the ALJ somehow failed to consider Plaintiff's impairments in combination. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its when it declares that it has considered a matter."). Therefore, the Court rejects Plaintiff's argument.

Plaintiff further alleges that the ALJ should have called a medical expert to address whether her impairments equaled a Listing because additional evidence may have changed the State agency psychologist's findings pertaining to medical equivalence (Pl.'s Br. at 17). This argument is purely speculative. The only evidence pertaining to Plaintiff's mental impairments following the State agency psychologist's review (Tr. 572-89, 605) was Dr. Truhn's report (Tr. 675-84, 691-93). He noted that Plaintiff's affect was appropriate and that, during the WAIS-III, she had good persistence and worked at an adequate pace and she did not have any problems following simple directions. He noted that she had many friends at church, which she attended regularly, watched television, walked, went to the library, cooked some, and grocery shopped (Tr. 675-84).

**(F)**     **Evaluation of the Medical Source Opinions of Dr. Truhn.**

Plaintiff next argues that the ALJ failed to properly evaluate the opinions of Dr. Truhn (Pl.'s Br. at 17-19). The undersigned, however, finds that the ALJ properly considered his opinions and gave them appropriate weight. The ALJ stated that she "considered opinion evidence in accordance with the requirements of 20 C.F.R. [§] 404.1527" (Tr. 67). As the ALJ found, and indeed as Plaintiff conceded at oral argument, Dr. Truhn was an evaluating, not a treating, psychologist (Tr. 67). As the ALJ also found, Dr. Truhn's opinions were inconsistent with other medical evidence of record (Tr. 67). His opinions were inconsistent with his own report which showed that Plaintiff had many friends at church, which she attended weekly, spent her time watching television and walking up to a quarter mild, went to the library occasionally, helped with the cooking, and grocery shopped with her husband (Tr. 675-84). His opinions were inconsistent with the findings of Drs. Lindsay and Keller, who on several occasions, found she had intact memory, normal fund of knowledge, and fluent/articulate language (Tr. 570-71, 609-10, 624-25). They were also inconsistent with the findings of Dr. Duvall, who found Plaintiff's memory "appeared quite intact" and she was able to pay attention and concentrate well enough to follow the conversation. He found she had no signs of psychotic difficulties with her thought process or content. He also found she was malingering and "[he saw] no reason she could not perform some type of work" (Tr. 561-67). *See, e.g., Eggleston*, 851 F.2d at 1247 (an ALJ may consider other medical opinion evidence in rejecting the opinion of a treating physician).

Plaintiff argues that, if the ALJ believed Dr. Truhn's opinions were deficient, she was obligated to re-contact him (Pl.'s Br. at 19). However, 20 C.F.R. § 404.1512(e) requires that,

> [W]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled . . . [w]e will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available.

Here, the ALJ did not find that Dr. Truhn's opinions were "inadequate." Rather, the ALJ found that Dr. Truhn's opinions were not supported by the objective medical evidence of record (Tr. 67). Thus, the ALJ was not required to re-contact Dr. Truhn.

**(G)**     **Plaintiff's Credibility.**

In evaluating a claimant's credibility, an ALJ must provide specific, legitimate reasons for her findings. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). However, a "formalistic factor-by-factor recitation of the evidence" is not required. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). To be upheld by a reviewing court, an ALJ need only set forth the specific evidence he relies on in evaluating a claimant's credibility. *See id.* Because the ALJ was in the best position to observe the demeanor of witnesses, her credibility findings deserve special deference. *See Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007). Plaintiff argues that the ALJ improperly evaluated her credibility (Pl.'s Br. at 19-21).

The ALJ found Plaintiff's subjective complaints were inconsistent with the objective medical evidence, including the findings of Drs. Murray (Tr. 220-31, 280, 282, 288, 291, 296, 307, 309, 313-22, 401), Carson (Tr. 237-39, 475-77), Lafrance (Tr. 408-09, 414-15), Lindsay (Tr. 609-16, 623-25, 642-47), Niehaus (Tr. 488-89, 508-09, 513-14, 652-53, 662-63, 656-69), Fraser (Tr. 421-24, 433), Long (Tr. 472-74, 485-86, 496-97, 500), Hochfield (Tr. 545-47, 552), Faddis (Tr. 549-50, 553-54), Keller (Tr. 570-71, 629-30), notes from the wound care clinic (Tr. 322-37, 339, 341, 351, 353-54, 356-58, 360-61, 367, 369, 370, 372-73, 375-76, 380, 382-83, 390-91, 393-94, 396, 400), Duvall (Tr. 561-67), and Truhn (Tr. 674-84). *See Huston*, 838 F.2d at 1132 (the consistency or compatibility of nonmedical testimony with objective medical evidence may be considered in evaluating credibility).

The ALJ also found there was strong evidence in the record that Plaintiff was malingering (Tr. 60, 62). In August 2006, Dr. Harris noted that her pain was "really out of proportion" to the examination in the hospital (Tr. 466-67). Dr. Duvall noted her speech was

"very odd" and "she stammered in the exactly same manner on several different words." This seemed an unlikely stammer and more an unsophisticated person's idea of a speech problem or stammer. Her stammer appeared and disappeared without apparent cause or notice. While she initially had work-finding problems, this disappeared after five to ten minutes. She also had "no non-verbal pain behavior at all," which was inconsistent with her many reports of constant pain and weakness. Her IQ scores also reflected a lack of effort and TOMM test results showed an exaggeration of her memory impairment (Tr. 561-67). Dr. Dance stated in March 2007 that he was "not sure if [examination findings] correlate[d] with malingering or not, but [he thought] that th[ese] were suspicious of it" (Tr. 616-17, 632-37). Dr. Niehaus noted in June 2007 that Plaintiff's speech "[was] difficult to understand like she [was] trying to have an accent" (Tr. 652-53). In March 2008, Dr. Truhn noted that she brought a cane to her evaluation, but did not seem to use it very much. And, even Dr. Truhn believed that Plaintiff malingered cognitive deficits (Tr. 675-84). *See Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990) (Commissioner appropriately discounted claimant's nonexertional impairment complaints due to lack of corroborative evidence and consulting physician's suspicion that the claimant was malingering).

Plaintiff's failure to seek treatment further undermined her subjective complaints (Tr. 60, 63). As noted above, she sought treatment for headaches once between January and November 2006 (Tr. 421-24, 433-35, 440-44, 466-77, 485-86, 488-89, 496-500, 508-09, 513-14, 530, 536-37, 542-50, 552-56, 560-67, 609-10, 623-25, 668-69). She did not see a doctor for headaches between February and May 2007 (Tr. 615-16, 621-22). *See, e.g., Huston*, 838 F.2d at 1132 (frequency of medical contacts and extensiveness of attempts (medical or nonmedical) to obtain relief may be considered in evaluating credibility).

As the ALJ also found, the evidence showed that Plaintiff's headaches were improved with Topamax (Tr. 609-16, 621-22, 624-25, 642-43, 646-47, 656-57, 668-69). *See, e.g., Kelley*,

62 F.3d at 338 (The ALJ could consider the extent to which claimant's impairment was controlled by medications in evaluating credibility). The evidence also showed that Plaintiff was not compliant with treatment (Tr. 64). In August 2006, Dr. Carson diagnosed "poor compliance with elevation" of her leg (Tr. 475-77). *See Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (Claimant's failure to regularly take the pain medication prescribed by his physician undermined credibility of pain testimony).

Plaintiff's daily activities also detracted from her credibility (Tr. 67). She did light cooking, helped her daughter do laundry, walked, attended church, went to the library, grocery shopped, did word searches, and volunteered at her daughter's school (Tr. 27, 150-57, 173-80, 561-67, 675-84). *See Huston*, 838 F.2d at 1132 (the nature of daily activities may be considered in evaluating credibility).

**(H)**     **Plaintiff's Residual Functional Capacity.**

Residual functional capacity "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical or mental activities." SSR 96-8p. Plaintiff argues that the ALJ improperly determined her residual functional capacity (Pl.'s Br. at 21-23). The Court disagrees.

In evaluating Plaintiff's physical residual functional capacity, the ALJ considered the findings of Drs. Carson and Lafrance (Tr. 64-65). Dr. Lafrance found in May 2005, that Plaintiff had good strength, tone, and bulk in her upper extremities. Her reflexes, sensation, and coordination were normal and her gait was only mildly difficult (Tr. 414-15). She also considered the findings of Dr. Lindsay (Tr. 60). Between November 2006 and February 2008, Dr. Lindsay consistently found motor examinations showing normal bulk and tone and full strength in all extremities. Plaintiff's reflexes were normal and her coordination was intact

(Tr. 610-16, 621-24). She also considered the findings of Drs. Niehaus, Fraser, and Long (Tr. 60, 63-65). In August 2006, Dr. Fraser found good equal bilateral grip strength. He found Plaintiff had normal sensation to touch in her lower extremities, only "slight" tingling in her left foot and ankle, no erythema in either thigh, and normal thigh turgor and muscle (Tr. 421-24, 433). The ALJ considered the findings of Drs. Hochfield and Faddis, who treated Plaintiff in October 2006 (Tr. 65-66). Dr. Hochfield found intact, active, and good strength on dorsiflexion and plantar flexion of the great toes bilaterally (Tr. 545-47, 552). Dr. Faddis found full mobility of the hips and knees with no knee instability (Tr. 553-54). The ALJ also considered the findings of Dr. Keller (Tr. 64), who in November 2006 found no fasciculation, tremors, or atrophy, normal tone, full muscle strength, normal reflexes, and intact sensation and coordination (Tr. 570-71). She also considered the findings of the State agency physicians (Tr. 67), Drs. Burner and Kehrli, who found in November 2006 and February 2007 respectively that Ms. Bassett could perform light work (Tr. 590-97, 606). In sum, this medical evidence supported the ALJ's finding that Plaintiff could perform the physical demands of a range of light work.

In determining Plaintiff's mental residual functional capacity, the ALJ considered the findings of Dr. Duvall (Tr. 62-64). As discussed above, Dr. Duvall found in November 2006 that Plaintiff had intact memory, the ability to pay attention and concentrate well enough to follow a conversation, and no psychotic difficulties with thought process or content (Tr. 561-67). The ALJ further considered the findings of the State agency psychologists (Tr. 67), who found in November 2006 and February 2007 respectively that Plaintiff could perform simple, routine tasks required limited contact with the public (Tr. 586-89, 605). This evidence supported the ALJ's finding that Plaintiff could perform the mental demands of work that involved simple, routine tasks with no frequent interaction with the general public.

The Court is not persuaded by Plaintiff's argument that the ALJ erroneously found her to be malingering, and based her finding on the "suspect results" of the TOMM. In finding that

Plaintiff was malingering, the ALJ based her findings on Dr. Duvall's objective findings discussed above (Tr. 561-67). The ALJ based her findings on Dr Dance's March 2007 findings (Tr. 616-17, 632-37), Dr. Niehaus' statement that her speech "[was] difficult to understand like she was trying to have an accent'" (Tr. 652-53), Dr. Truhn's note that she brought a cane to her evaluation but did not seem to use it much, and Dr. Truhn's own acknowledgment that there seemed to be malingered cognitive deficits

(Tr. 675-84).

## **ORDER**

As outlined above, the Court concludes the Commissioner applied the correct legal standards, and concludes her decision is supported by substantial evidence. Accordingly, the decision of the Commissioner is **AFFIRMED**. Judgment shall be entered in accordance with Fed. R. Civ. P. 58, consistent with the United States Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292, 296-302 (1993).

DATED this 19th day of April, 2010.

BY THE COURT:

BROOKE C. WELLS
United States Magistrate Judge

-33-